ALDEN H., Sr., Appellant,

v.

STATE of Alaska, OFFICE OF
CHILDREN'S SERVICES,
Appellee.

No. S–11450.

Supreme Court of Alaska.

March 4, 2005.

Chad W. Holt, Holt & Brockberg, LLC, Anchorage, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee State of Alaska.

Leslie Dickson, Assistant Public Advocate, Anchorage, for Appellee Guardian ad Litem.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Alden H. is the father of two severely troubled boys, Alden, Jr. and Neil.[1] In 2000 Alden voluntarily relinquished his parental rights.[2] He is now attempting to withdraw his relinquishment and re-enter his sons' lives. Alden moved before the superior court for a hearing to review his relinquishment and for an order to enforce a provision of the relinquishment purporting to grant him visitation rights. The superior court denied both motions and Alden appeals. Finding no error, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

Alden H. is the father of Alden H., Jr. and Neil H. The boys' mother is Sara B. She is not a party to this action. Alden and Sara lived together in Anchorage with Alden Jr.,

Neil, and Sara's two older children by a different father, Zander and Nancy. The Alaska Department of Health and Social Services[3] had received reports of substance abuse, neglect, and domestic violence but had lost track of the family because of frequent moves. On June 4, 1998 the Anchorage Police Department responded to a report that a child had been left unattended in a stroller all day. The police discovered Neil in a stroller in the driveway of the family's home, and found Sara inside, asleep, and smelling of alcohol.

After this incident, the family fled to a Fairbanks campground. On June 11, 1998 Zander ran to the police recounting a variety of abuses—including being forced to drink alcohol and ingest hallugenic mushrooms, and physical abuse by Alden. At the time, Zander was reportedly filthy and suffering from bronchitis. All four children were taken into state custody. Like Zander, the others were "filthy, with dirt in their hair, ears, eyes, mouth and genital areas." Neil was diagnosed with conjunctivitis. Nancy later reported that Alden had sexually abused her. Zander added that Alden had threatened to kill Zander and Nancy if Nancy ever reported the abuse.

The department developed a family reunification plan for Alden and Sara. The plan required both parents to work toward permanent sobriety, receive counseling for anger management, and attend parenting classes. Neither parent complied. In 1999 Alden spent ninety days in jail on a domestic violence charge. After his release, he was arrested on federal drug charges related to the manufacture of methamphetamines. He was later convicted and sentenced to seventy months in prison.

In June 2000 the department placed the boys with Alden's mother, Meg H. The department commenced proceedings to termi-

---

1. Pseudonyms have been used for all family members throughout this opinion in order to protect their identities.

2. Alden voluntarily relinquished his parental rights pursuant to AS 25.23.180(b): "All rights of a parent with reference to a child, including the right to receive notice of a hearing on a petition for adoption, may be relinquished and the rela-

tionship of parent and child terminated by a writing...."

3. Appellee Office of Childrens' Services is the successor to the Division of Family and Youth Services in the Alaska Department of Health and Social Services. It is referred to in this opinion as "the department."

nate the parental rights of Alden and Sara in August 2000. On December 27, 2000, prior to trial, Alden executed a voluntary relinquishment of his parental rights from federal prison in California. The relinquishment specified that Alden retained the right to contact his children subject to the discretion of the adoptive parents. The relinquishment also stated that the children would be placed for adoption with Meg, and that if Meg ever became unable to care for the boys for any reason, the department would contact Alden, and give him an opportunity to request the withdrawal of his relinquishment subject to the approval of the department. Sara's parental rights were involuntarily terminated on January 22, 2001.

The boys were removed from Meg's home in October 2001 following reports of abuse. The children were subsequently separated and placed in therapeutic foster care. Both suffer from severe emotional and behavioral problems; each has been through several foster homes. According to therapists who have treated Alden Jr. and Neil, "[v]ery skilled therapeutic foster parents with additional case manager and activity therapy support are, at times, taxed to their limit [in] maintaining the boys adequately." These therapists believe that an appropriate care giver would need "stellar therapeutic parenting skills, saintly patience, and an extensive working knowledge of developmental issues of emotionally disturbed children."

Alden was transferred from prison to a halfway house in Spokane, Washington in February 2002. While incarcerated, he stopped drinking and taking drugs. He reportedly remains sober. Alden was released from federal custody in August 2002. As of May 2003, he planned to marry a woman he had met at the halfway house. His fiancée has four children—including a twenty-year-old daughter with a young child. He currently works as an independent contractor in the Spokane area. Alden learned that the boys had been removed from Meg's home in April 2002 and promptly requested the withdrawal of his relinquishment.

**B. Proceedings**

Alden moved for a hearing to review the order terminating his parental rights on January 5, 2004. He claimed that the relinquishment had been conditioned on the permanent placement of his boys with Meg and that the relinquishment should be withdrawn because that placement had failed. He also argued that he had a right to withdraw his relinquishment pursuant to *Rita T. v. State*[4] because he had overcome his substance abuse problems and was gainfully employed. On January 12, 2004 he added a motion to enforce visitation rights he claimed were contained within the relinquishment agreement. The department opposed both motions.

Alden's motions were reviewed by William C. Hitchcock, Standing Master of Anchorage Children's Court. Neither party requested oral arguments or an evidentiary hearing before Master Hitchcock. Briefing was completed on February 25, 2004 and Master Hitchcock issued his recommendation shortly thereafter. The master recommended denying both of Alden's motions. He found that the relinquishment agreement was not conditioned on the successful placement of the boys with Meg, that Alden had failed to show good cause for a *Rita T.* hearing, and that the department soundly exercised its discretion by refusing to allow Alden to have contact with his children. Alden objected to Master Hitchcock's recommendations and asked for a hearing *de novo* before the superior court. On March 30, 2004, Superior Court Judge Peter A. Michalski adopted Master Hitchcock's recommendations as the order of the court without alterations and without specifically ruling on Alden's demand for a hearing. Alden appeals from this decision.

**III. STANDARD OF REVIEW**

 Ordinarily, we review the validity of a relinquishment *de novo*.[5] However, this issue was raised for the first time on appeal. "Issues not raised in the trial court shall not be considered on appeal, except for plain error. Plain error exists 'where an obvious

---

4. 623 P.2d 344 (Alaska 1981).

5. *In re Adoption of Keith M.W.*, 79 P.3d 623, 625 (Alaska 2003).

228

mistake has been made which creates a high likelihood that injustice has resulted.' " [6] We review the superior court's decision to enforce the relinquishment for plain error.

■■■ We review the factual conclusions of a lower court for clear error.[7] We will find clear error "if a review of the entire record in the light most favorable to the party prevailing below leaves us 'with a definite and firm conviction that a mistake has been made.' " [8]

■ A finding that a party failed to show good cause that a *Rita T.* hearing should be held is reviewed for abuse of discretion.[9]

■■■ We review the superior court's decision to deny *de novo* review of the master's report also for abuse of discretion.[10] We will find an abuse of discretion only if, based on a review of the whole record, we are left with a definite and firm conviction that a mistake has been made.[11]

## IV. DISCUSSION

### A. Enforcing the Relinquishment Was Not Plain Error.

■■■ Alden relinquished his parental rights subject to AS 25.23.180(b). We have recognized that the termination of parental rights did not exist at common law and that no termination is valid without statutory authorization.[12] In *In re Adoption of Keith M.W.*,[13] we noted that AS 25.23.180(b) authorizes only the complete relinquishment of parental rights.[14] The statute does not authorize conditional or partial relinquishments.[15]

Alden argues that his voluntary relinquishment was conditional because it required the adoptive placement of his boys specifically with his mother, or that it was partial because he reserved a right of contact with his children, or both. Because conditional and partial relinquishments are not authorized by AS 25.23.180(b), Alden contends that the relinquishment was void and that it was error for the superior court to enforce it. Since Alden did not raise this issue before the superior court, we review for plain error.[16] Plain error exists " 'where an obvious mistake has been made which creates a high likelihood that injustice has resulted.' " [17] Because the relinquishment was not conditioned on the placement of his children with his mother, and because the master's finding that "the relinquishment was not conditioned on the provision of visitation rights" was not a mistake (much less an obvious mistake), we affirm the superior court.

### 1. The relinquishment agreement was not conditioned on placement of the children with Alden's mother, Meg H.

■ Master Hitchcock found "nothing which supports [Alden's] assertion that failure of the placement gave rise to an automatic right to withdraw the relinquishment and thus vacate the termination order." We agree. The relinquishment contained no lan-

6. *D.J. v. P.C.*, 36 P.3d 663, 667–68 (Alaska 2001) (quoting *Broeckel v. State, Dep't of Corrections*, 941 P.2d 893, 897 (Alaska 1997)).

7. *Brynna B. v. State, Dep't of Health & Soc. Servs.*, 88 P.3d 527, 529 (Alaska 2004).

8. *Id.* (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000)).

9. *C.L. v. P.C.S.*, 17 P.3d 769, 772 (Alaska 2001) (finding of good cause to deviate from Indian Child Welfare Act (ICWA) placement preferences is reviewed for abuse of discretion).

10. *Faulkner v. Goldfuss*, 46 P.3d 993, 996 (Alaska 2002).

11. *Stinson v. Holder*, 996 P.2d 1238, 1242 (Alaska 2000).

12. *Perry v. Newkirk*, 871 P.2d 1150, 1153 (Alaska 1994) (citing Stephen B. Presser, *The Historical Background of the American Law of Adoption*, 11 J. Fam. L. 443 (1972)); *see also S.J. v. L.T.*, 727 P.2d 789, 797 (Alaska 1986).

13. 79 P.3d 623 (Alaska 2003).

14. *Id.* at 627.

15. *Id.*

16. *D.J. v. P.C.*, 36 P.3d 663, 667–68 (Alaska 2001). Alden concedes that the plain error standard applies.

17. *Id.* (quoting *Broeckel v. State, Dep't of Corrections*, 941 P.2d 893, 897 (Alaska 1997)).

guage specifying that the relinquishment is void if the placement with Meg H. should fail.[18] The relinquishment actually stated that the placement with Meg H. itself was conditional. According to the agreement, the department must receive "a positive home study ... before the Department can consent to adoption of [Alden Jr.] and [Neil] by [Meg H.]" The agreement also allowed Alden to request the withdrawal of his relinquishment if the placement with Meg H. failed, but it explicitly noted that Alden could withdraw his relinquishment only if the department agreed to allow it. The relinquishment was therefore not conditioned on the successful placement of the children for adoption with Meg H.

**2. Enforcing the relinquishment in light of language purporting to preserve a right of contact was not plain error.**

 Alden also argues that the relinquishment is void because it retained a right of contact. We disagree for two reasons. First, Master Hitchcock concluded that the relinquishment agreement did not preserve a right of contact. This interpretation is not obviously mistaken. Second, even assuming that the relinquishment agreement did retain Alden's right of contact, Alden cannot be heard now to claim that it was an obvious mistake, for in the superior court he adamantly insisted that the court enforce the agreement.

**i. Master Hitchcock did not make an obvious mistake by interpreting the relinquishment agreement as not preserving a right of contact.**

Master Hitchcock concluded that the relinquishment agreement did not preserve Alden's right to contact his children. Because Master Hitchcock was not obviously mistak-

en in his interpretation of the relinquishment, there is no plain error.

 The relinquishment agreement stated generally that Alden retained certain rights:

> I give this relinquishment in accordance with AS 25.23.180. *Subject only to those rights specifically retained as set forth in this relinquishment,* I voluntarily relinquish to the Department of Health and Social Services ... any and all rights and responsibilities of a parent with respect to these children.

(Emphasis added.) The right of contact was the only retained right specifically mentioned by the relinquishment.

> [Paragraph] 7. I retain the right of contact with my children to be arranged in advance with the adoptive parents, in their sole discretion based on the best interests of the children. Such contact includes visitation, writing letters, and the exchange of photographs and gifts.

Under this provision, Alden's "right of contact" with his children is subject to the "sole discretion" of the adoptive parents in determining the children's best interests. It is, therefore, quite circumscribed. Master Hitchcock accordingly determined that this paragraph did not actually preserve a "right" of contact. He found that "the relinquishment was not conditioned on the provision of visitation rights. Paragraph 7 of the document provides a 'right of contact' but conditions it on the discretion of the adoptive parents 'based on the best interests of the children.'" Because this interpretation was not mistaken (much less obviously mistaken), we decline to find the enforcement of the relinquishment to be plain error.[19]

**18.** The relinquishment deemed "conditional" in *Keith M.W.* contained such language: "If the adoption [by the Wilsons] is not completed, I understand that this relinquishment will be voided." 79 P.3d at 627.

**19.** Master Hitchcock did not address whether the relinquishment merely expressed Alden's desire that any future adoption decree include a visitation provision. Nor do we. Because superior courts are afforded discretion to fashion open adoption decrees, AS 25.23.130(c), *Matter of A.F.M.*, 960 P.2d 602, 605–06 (Alaska 1998), a natural parent is entitled to request the inclusion of visitation rights in a future decree. Alaska's general prohibition on conditional relinquishments forbids, however, the conditioning of a voluntary relinquishment of parental rights on the eventual inclusion of such visitation rights.

**ii. Even assuming that the relinquishment improperly purported to preserve a right of contact, the superior court did not commit plain error in enforcing the relinquishment.**

■ Assuming *arguendo* that the relinquishment agreement improperly purported to preserve a right of contact, enforcing the relinquishment was not an obvious mistake because Alden demanded that Master Hitchcock and the superior court enforce the relinquishment agreement. On appeal, Alden claims that the superior court made an obvious mistake by not recognizing that Alden was asking for the enforcement of a void agreement. This position is not tenable. According to Alden, the superior court's purported mistake consisted of failing to void a "conditional" relinquishment *sua sponte* even though Alden himself demanded enforcement below. There is no obvious mistake under these circumstances.[20]

**B. The Master's Finding that Evidence Supported the Department's Decision To Deny Visitation Was Not Clearly Erroneous.**

Alden has not been allowed any contact with his children since they were removed from Meg's home in October 2001. Alden argued below that he "should be allowed reasonable visitation with his children" in accordance with the terms of the relinquishment agreement. Master Hitchcock upheld the department's decision to deny visitation. He ruled "that the Department is soundly exercising its discretion, based on the expert opinion of the children's therapists, in presently restricting contact between [Alden] and the children."

■ On appeal, Alden asserts that Master Hitchcock's finding is clearly erroneous because "[t]here is no evidence which supports the continued denial of [Alden's] right to contact." Because the record contains ample evidence supporting Master's Hitchcock's finding, we affirm.

Master Hitchcock reviewed various documents submitted by the department, including the recommendations of the children's therapists and a psychological evaluation of Alden. (Master Hitchcock also reviewed letters and certificates submitted by Alden.) A review of this evidence does not leave us with the firm conviction that Master Hitchcock was mistaken. Contrary to Alden's assertion that "no evidence" supports the denial of visitation, the documentary evidence shows clearly that contact is not currently in the best interests of the children. Moreover, Alden has not submitted any evidence demonstrating that visitation serves the best interests of the children.

Master Hitchcock reviewed a December 1, 2003 letter and a February 19, 2004 affidavit from an outpatient therapist who had treated Alden Jr. since May 2001. In the letter, the therapist wrote: "[Alden Jr.] should not have any contact with his biological father at this time. 'Any contact' would include telephone and written correspondence as well as face to face." The therapist listed several reasons why there should be no contact:

> Contact at this time could destabilize [Alden Jr.] ... [Alden Jr.] would have increased difficulty with concentration, attention, impulsivity, and oppositional behavior ... [Alden Jr.] would use the concept of a future relationship with his biological father as a reason to defy adult authority figures and act out with negative behavior towards others. In the past when [Alden Jr.] acts out he is frequently a danger to himself and others.

He concluded that "[Alden Jr.] should be successfully placed in a permanent placement for a minimum of one year prior to considering introducing the relationship of his biological father." He repeated these conclusions in his affidavit.

The department also submitted a February 19, 2004 affidavit from a therapist who had treated Neil for the past three years. The affidavit described Neil as a "severely emotionally disturbed child who is very ag-

**20.** *See Barrett v. State,* 772 P.2d 559, 568–69 n. 10 (Alaska App.1989) (discussing doctrine of invited error: party that requested instruction not entitled to obtain reversal based on giving of instruction).

gressive, oppositional and defiant, has ADHD, pervasive development delays, enuresis, encopresis and attachment disorder." The therapist believed that Neil "should not have any contact with his biological father." In her opinion, "[c]ontact with his biological father will result in increased difficulties maintaining [Neil] in his home as [Neil] would become increasingly aggressive, defiant and oppositional, his enuresis and encopresis will increase tremendously." Moreover, before there is any consideration of introducing Neil to his father, "[Neil] needs to show signs of stability and progress with his behavioral issues . . . ."

Both therapists described the results of reintroducing the children to their father in a joint letter. The letter stated that "[i]t is difficult to evaluate the possible father-son relationship that the boys might develop in the future without having any credible evaluations of [Alden, Sr.]." They warned, however, that "[a]ny contact, and certainly any inappropriate contact, that the boys might have with their biological father could cause them to regress significantly. . . . Hence, beginning a relationship with him at this time . . . is only going to make the boys' lives more confusing and problematic."

Master Hitchcock also reviewed documents submitted by Alden in support of his motion to enforce his visitation rights. This evidence consisted of a letter from an outpatient clinic that had treated Alden for his drug problems following his release from federal prison, a letter from a halfway house where Alden had stayed after release from prison, various occupational and religious certificates, and a letter from Alden's probation officer. These documents supported Alden's contention that he is sober and working. They did not, however, provide any evidence of his children's needs or any evidence that contact with Alden serves their best interests.

Because the record contained substantial evidence that even minimal contact between Alden and his children would have negative consequences, and because Alden submitted no evidence that contact would serve their best interests, there is no hint of clear error on this issue.

## C. Alden Is Not Entitled to Relief Under *Rita T. v. State*.[21]

██ *Rita T. v. State* announced that a parent whose parental rights have been involuntarily terminated is entitled to a hearing to review the termination order, upon a showing that the parent has overcome the problems that lead to termination and is now capable of properly caring for the child.[22] This entitlement promotes the purposes of title 47 of the Alaska Statutes by enlarging the potential supply of permanent care givers and reuniting families.[23] It was based on the proposition that allowing a parent who is capable of providing proper care to regain her parental rights is preferable to allowing a child who remains "a ward of the court . . . to spend his or her entire minority in a succession of foster homes." [24]

We have never decided whether the right announced in *Rita T.* is available to parents who voluntarily relinquish their parental rights pursuant to AS 25.23.180 and we need not address this issue here. Even assuming that Alden could seek relief under *Rita T.*, the superior court did not abuse its discretion by holding that Alden failed to show good cause.

██ Good cause for a *Rita T.* hearing can "be established if the parents showed that it would be in the best interests of the child to resume living with them because they have sufficiently rehabilitated themselves so that they can provide proper guidance and care

21. 623 P.2d 344 (Alaska 1981). The department's concern that *Rita T.* reflects an anachronistic emphasis on family reunification is misplaced. *Rita T.* does not privilege a parent's desire to regain custody over the best interests of the child. Entitlement to a *Rita T.* hearing requires a parent to show both that she is rehabilitated and that she is currently capable of providing "the care and guidance 'that will serve the

moral, emotional, mental and physical welfare of the child[.]' " *Id.* at 347 (quoting AS 47.05.060).

22. *Id.* at 347.

23. *Id.*

24. *Id.*

for the child."[25] A parent can provide proper guidance and care if he can "provide the care and guidance 'that will serve the moral, emotional, mental and physical welfare of the child[.]' "[26]

Master Hitchcock concluded that Alden had not shown good cause:

> Looking at the factual basis for the adjudication of these Children in Need of Aid, and the subsequent treatment efforts of [Alden], I find the evidence does not support a finding that he has 'sufficiently rehabilitated' in order to reassume custody of these children. I base that conclusion in large part upon the special needs of the children and the expert opinions of their therapists. I do not find that good cause has been shown to warrant setting aside the relinquishment. . . .

Alden contends that the superior court abused its discretion because Master Hitchcock's finding relied on the reports of the children's therapists, who had never met Alden. Accordingly, the therapists' recommendations relied only on their contact with the children and their knowledge of the children's history.

Master Hitchcock's partial reliance on the opinions of the children's therapists was wholly appropriate.[27] Alden's ability to adequately care for his children depends not only on his rehabilitation but also on the needs of his children. *Rita T.* does not deem a parent who has "rehabilitated" himself automatically capable of caring for his children. *Rita T.* requires a parent to have the capability of providing for the individual needs of the child. Good cause exists only for those parents "who can now provide the care and guidance 'that will serve the moral, emotional, mental and physical welfare of the child. . . .' "[28] Consequently it is not only appropriate but necessary for a court to consider the needs of the child who is the subject of a *Rita T.* motion. To do that, the court properly considered evidence from the children's therapists.

Master Hitchcock's finding that Alden had not shown good cause to believe that he was capable of providing for the needs of his children was well supported by the record. According to the reports submitted by the children's therapists, Alden's children have very demanding needs: "Very skilled therapeutic foster parents with additional case manager and activity therapy support are, at times, taxed to their limit [in] maintaining the boys adequately." The therapists opined that a care giver for the children should have "stellar therapeutic parenting skills, saintly patience, and an extensive working knowledge of developmental issues of emotionally disturbed children."

The psychological evaluation of Alden conducted by Dr. Thomas McKnight suggests that Alden's parenting abilities do not approach these requirements. Dr. McKnight opined that Alden most likely has "limited to no insight into the needs of his children or the realities of a parent-child relationship." Additionally, he concluded that Alden's "desire to assume parent responsibility for his boys is admirable but there is no reasonable psychological probability he can provide the environment, support, and stability these children need. . . ."

Even if Alden's children did not have special needs, Master Hitchcock's decision would not have been an abuse of discretion because the evidence offered by Alden to show that he had overcome the problems that led the department to institute termination proceedings was weak. The department's original case plan for family reunification required that Alden (1) "complete an anger management assessment and follow all recommendations," (2) "attend on an ongoing basis AA/NA/CA meetings," (3) "complete a state certified substance abuse program," and (4) "enter and complete parenting class." Alden submitted evidence to Master Hitchcock indi-

25. *Id.*

26. *Id.* (quoting AS 47.05.060).

27. Because Master Hitchcock reviewed evidence both of Alden's rehabilitation and parenting capabilities and the special needs of his children, we do not decide whether a court would be justified in relying solely upon evidence provided by a child's therapist.

28. *Rita T.,* 623 P.2d at 347.

cating that he had completed a substance abuse program. The evidence that he complied with the other criteria was flimsy.

The only evidence in the record that Alden attended twelve-step programs, and the main evidence that he addressed his anger management issues [29] or attended parenting classes,[30] is found in a May 10, 2002 letter from James Barrett.[31] Master Hitchcock had good reasons to question Barrett's credibility. In preparation for his psychological evaluation of Alden, Dr. McKnight reviewed a "psychological report" of Alden prepared by Barrett. Dr. McKnight noted in his report that Barrett was unqualified to conduct a psychological evaluation—and may have done so in violation of Washington law. Additionally, Dr. McKnight determined that Barrett performed the evaluation incompetently. Consequently, it was reasonable for Master Hitchcock to discount the credibility of Barrett's letter.

Even if Barrett was credible, the letter was scant evidence of Alden's rehabilitation. It asserted that he had completed anger management classes while incarcerated, attended two twelve-step meetings per week, and that one of the primary goals of Alden's 500 hour Drug Abuse Program was to "improve parenting skills." It did not discuss the scope of Alden's anger management classes or the extent to which the Drug Abuse Program focused on parenting skills. Additionally, it only reflected Alden's participation in twelve-step programs up until May 2002. There was no indication in the record whether Alden continued to seek treatment after this date. We are not firmly convinced that Master Hitchcock was mistaken based on this evidence.

Because the record demonstrated that Alden did not have the ability to properly care for the special needs of his children, and because the evidence offered by Alden to prove his rehabilitation was weak, the superior court did not abuse its discretion in denying a hearing under *Rita T.*

### D. The Superior Court Did Not Abuse Its Discretion in Failing To Hold a *De Novo* Hearing.

■ Alden claims that the superior court erred in denying him a hearing *de novo* to review Master Hitchcock's recommendation that the superior court deny Alden's motion for visitation. Alden first requested a hearing in his objections to Master Hitchcock's report pursuant to Alaska Child in Need of Aid (CINA) Rule 4(f), which states that the "superior court may permit oral argument, order the taking of further evidence, or grant a hearing de novo" in response to objections to a master's report or recommendations. By specifying that a superior court "may permit" hearings or oral arguments, CINA Rule 4(f)(1) invests a superior court with discretion to grant or deny such a proceeding.

We conclude that the superior court did not abuse its discretion in denying a hearing. In his objection to Master Hitchcock's report, Alden argued that he should have received an evidentiary hearing "in order to present evidence and cross examine adverse parties and witnesses." Alden failed to mention, however, what new evidence he intended to present at the hearing or explain why such evidence was absent from his submissions to Master Hitchcock. It is within the superior court's discretion to deny a hearing request-

---

29. Alden also contends that notes from a telephone conversation with the case worker for his children, Heather Rough, constituted evidence that he completed anger management classes. The notes read: "4/23/02 TCT [Alden H]—6:30 pm ... Released now, in halfway house ... 500 in patient program / 40 hr drug class / Anger mngmt. Currently checking into parenting classes. April 19th 1999—clean/sober." It is not at all clear from these notes that Heather Rough was intending to record that Alden had told her that he had completed anger management classes. Moreover, even if it was clear that

Alden communicated to Rough that he had done so, this fact does not establish that Alden actually completed anger management classes.

30. Rough's notes also mention that Alden was "Currently checking into parenting classes." This implies that he had not completed any parenting classes in prison.

31. Associate Director of the New Directions Outpatient Clinic, a substance abuse and mental health clinic in Spokane, Washington.

ed for the purpose of presenting unspecified evidence.

Alden also suggested that because he "has submitted a great deal of evidence ... [h]e should at least be presented with the opportunity to present this evidence at a hearing." It is also well within the discretion of the superior court to deny Alden the opportunity to duplicate an earlier presentation of evidence.

Lastly, Alden argued that he should have been allowed to cross-examine witnesses, especially the children's therapists. But Alden does not indicate how an opportunity to cross-examine witnesses would have illuminated the evidence presented. He repeated his argument that the opinions of the therapists were not reliable because neither of them had met Alden. We have already rejected this argument. Moreover, Alden made this argument in his response to the department's oppositions and Master Hitchcock was aware of it when he made his findings.

Finally, even if the superior court abused its discretion, Alden is not entitled to relief because he has not alleged any prejudice resulting from the superior court's denial of a hearing.[32] "A party on appeal who alleges that oral argument was improperly denied must show both that the denial was in error and that the error caused substantial prejudice."[33] Neither in support of his request for a hearing, nor in this appeal, has Alden advanced one argument that he was unable to make before the master or list any evidence that he could not present. He argued only that he deserved to fully present the evidence he had already provided at a hearing and that he should have the opportunity to cross-examine the witnesses. Because Alden has not alleged any prejudice, any error by the superior court in denying a hearing is not reversible.

## V. CONCLUSION

Because enforcing the relinquishment was not plain error, because the department did not abuse its discretion in denying Alden contact with his children, because the superior court did not abuse its discretion in denying a *Rita T.* hearing, and because the superior court did not abuse its discretion in denying a *de novo* hearing, we AFFIRM the decision of the superior court.

**32.** *Bennett v. Hedglin,* 995 P.2d 668, 674 (Alaska 2000).

**33.** *Id.* (citing *Cleary Diving Serv., Inc. v. Thomas, Head & Greisen,* 688 P.2d 940, 942 (Alaska 1984)).