LARA S., Appellant,

v.

STATE of Alaska, DEPARTMENT OF
HEALTH & SOCIAL SERVICES, Of-
fice of Children's Services, Appellee.

No. S–13209.

Supreme Court of Alaska.

June 5, 2009.

Jill Wittenbrader, Assistant Public Defend-
er, and Quinlan Steiner, Public Defender,
Anchorage, for Appellant.

Laura C. Bottger, Assistant Attorney Gen-
eral, Anchorage, and Talis J. Colberg, Attor-
ney General, Juneau, for Appellee.

Dianne Olsen, Law Office of Dianne Olsen,
Anchorage, Guardian Ad Litem.

Before: FABE, Chief Justice,
EASTAUGH, CARPENETI, WINFREE,
and CHRISTEN, Justices.

FABE, Chief Justice.

## I. INTRODUCTION

After struggling with her drug problem, failing in two inpatient treatment programs, and experiencing difficulty working on her Office of Children's Services case plan, a mother of three boys voluntarily relinquished her parental rights. But when the trial court vacated its order placing the children with relatives, the mother requested a review hearing to rescind the termination of her parental rights. The mother initially argued that the placement change entitled her to a hearing, but she eventually pointed to recent steps taken to secure a full-time job and to attend one or two narcotics or alcoholics anonymous meetings a week. The trial court denied the mother's motion for a review hearing, reasoning that she was not entitled to a hearing because her affidavit failed to establish the three statutory requirements: (1) that it was in the children's best interests that her parental rights be reinstated, (2) that she had successfully addressed her substance abuse problem, and (3) that she was

capable of caring for her children. Because the trial court did not abuse its discretion in determining that the mother failed to make a sufficient showing of good cause to entitle her to a hearing under AS 47.10.089(h), we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

Lara is the mother of three boys, Earl, Herb, and Roan.[1] Earl, born in 1999, did not have a relationship with his biological father, Don, until child in need of aid (CINA) proceedings were initiated in 2005. Ron is the biological father of both Herb, born in 2003, and Roan, born in 2005.

In January 2005 the Office of Children's Services (OCS) received a report that Lara was abusing substances while she was pregnant with Roan and caring for Earl and Herb. After having tested positive for cocaine, Lara admitted to using cocaine and agreed to follow a care and safety plan to ensure her children's safety and to prevent their removal from her home. Under the plan, Lara agreed to receive a substance abuse assessment, follow through with treatment recommendations, undergo random urinalysis testing twice a week, attend all doctor appointments, and apply for financial assistance.

Lara tested positive for cocaine again in late February 2005 after she had failed to make two appointments for urinalysis tests earlier that month. According to OCS, it made repeated attempts through telephone calls and home visits to contact Lara to discuss her positive urinalysis test and her care and safety plan. On March 21, 2005, a social worker visited the home of Lara and Ron, who both appeared to be under the influence of drugs. Lara admitted to using cocaine and OxyContin. That day OCS took emergency custody of Earl and Herb and immediately filed an emergency petition for adjudication of the children as in need of aid and for temporary placement. A case plan was established for Lara, requiring (1) "substance abuse assessment/treatment," (2) "[urinalysis] testing," (3) "mental health evaluation and treatment," and (4) "parenting classes." The plan also provided that Lara would have visitation with her children.

Lara completed a substance abuse assessment with the Salvation Army's Clitheroe Center on March 29, 2005. The assessment recommended that Lara participate in ninety days of inpatient treatment with the Clitheroe Center's Reflections program while she waited for an opening at another treatment facility, Dena A Coy. Lara tested positive for cocaine on April 1 and was admitted to detox at the Clitheroe Center. Lara entered Reflections' residential treatment program on April 18 but left after four days. The discharge recommendation was that Lara complete a ninety-day inpatient treatment program. On April 27 Lara was assessed by Dena A Coy and she entered into an intensive outpatient treatment program. During the month of April Lara took three urinalysis tests, two of which were positive, and failed to make seven other appointments for urinalysis tests. Lara failed to take any urinalysis tests in May.

Lara's third son, Roan, was premature when he was born on June 19, 2005. After Roan tested positive for cocaine and opiates, Lara acknowledged using cocaine and OxyContin just before Roan was born. Roan was administered morphine and phenobarbital to manage his withdrawal symptoms and to avoid seizures. OCS took emergency custody of Roan on June 20 and the next day filed an emergency petition for adjudication of Roan as in need of aid and for temporary placement. After spending six weeks in a neonatal intensive care unit, Roan was discharged to a medical foster home in early August. Although Lara was permitted to spend unlimited time with Roan while he was in the hospital, her visits were infrequent and short. But Lara attended most of her OCS-supervised visits after Roan was placed in a foster home.

Dena A. Coy reported on June 28, 2005, that Lara had failed to comply with her treatment program but that she had re-engaged in the previous week. Lara had two negative urinalysis tests on June 22 and July

---

1. We adopt the pseudonyms used by the parties to protect the family members' privacy.

18 but again tested positive for cocaine on July 28. Lara failed to take any urinalysis tests in August, and on August 17 OCS received a report that Lara was using crystal meth. Lara took one urinalysis test in September, which was positive for opiates. Lara missed 67 of her 102 appointments for urinalysis tests between late April and early September. Due to lack of attendance and compliance, Lara was discharged from Dena A. Coy's outpatient program in early September.

Lara took two urinalysis tests in October and twice tested positive for opiates. Lara failed to make any of her appointments for urinalysis tests from November to mid-December.

Lara completed an assessment with Cook Inlet Tribal Council's First Step program in late November 2005. Lara did not sign a release for OCS to receive information concerning her participation in the program and it is undisputed that she was not truthful during the assessment, maintaining that she was compliant with her urinalysis testing and that she had not abused substances since June 19, 2005, the day she gave birth to Roan. Perhaps because of Lara's lack of candor during the assessment, Cook Inlet Tribal Council's recommendation differed from the two earlier recommendations for ninety days of inpatient treatment and only advised that she participate in intensive outpatient treatment.

Guardian ad litem Shirley Perry expressed concern over Lara's lack of progress during the first year of treatment under her case plan in a February 17, 2006 disposition report:

> It is extremely concerning that [Lara] has not effectively engaged in treatment in the year since the first case plan. She waited four months to get an assessment, entered and left Clither[oe] treatment, entered Dena [A] Coy out-patient, refused a bed for inpatient treatment (where she could have had her son placed with her), and missed half of the sessions over the next six months. She has continued to test positive for cocaine and opiates about once per month. Now she has completed another assessment at [Cook Inlet Tribal Council] for treatment but lied to the assessors and has not been forthcoming with the providers about her true compliance. [Lara] has never complied in a consistent manner with [urinalysis] testing or treatment.

Perry also noted that Lara has a "history of depression and mental health issues, which have not been addressed." With regard to the parenting component of Lara's case plan, Perry reported that although Lara had attended some parenting classes at Dena A. Coy, she had missed a "significant" number of sessions. Lara had also participated in Cook Inlet Tribal Council's parenting classes.

All of Lara's three children have struggled with developmental problems. Earl, the oldest, was transferred to an acute care facility in Georgia when his father, Don, reported that his behavior was unmanageable. Upon his return to Anchorage, Earl was placed in a therapeutic foster home to provide him with a higher level of care to address his significant psychological needs relating to his aggressive behavior, incidents of isolating himself, and diagnosis of post-traumatic stress disorder. Lara's second son, Herb, has displayed anger outbursts and aggressive behaviors, and it was recommended that he enroll in day care to help him socialize. Roan, the youngest, suffered drug withdrawal symptoms when he was born premature, and he has some physical motor delays.

## B. Proceedings

A day after OCS took emergency custody of Earl and Herb on March 21, 2005, it filed an emergency petition for adjudication of the children as in need of aid and for temporary placement. Following a hearing on March 30, the superior court found that there was probable cause to believe that Earl and Herb were children in need of aid. OCS took emergency custody of Roan on June 20 and filed an emergency petition for adjudication of Roan as in need of aid and for temporary placement on June 21. In mid-July the parties stipulated that Roan was a child in need of aid and the superior court adopted the stipulation.

The CINA cases for all three children were consolidated in August 2006. In October the parties stipulated that the children were in need of aid and the superior court adopted the stipulation.

In March 2006 OCS reported that as a result of a recent permanency planning conference, it had changed its goal for all of the children from reunification to adoption and that it intended to file a petition for termination of parental rights. In April the superior court found that the children continued to be in need of aid and noted that "[t]he permanent plan for these children is adoption." In July OCS filed a petition to terminate the parental rights of Lara, Don, and Ron.[2]

Lara requested a placement review hearing in December 2006, seeking placement of her children in the home of Herb and Roan's paternal aunt, Tessa, and Tessa's boyfriend, Jim. The State opposed this placement for a number of reasons, including Jim's problem with alcohol and criminal history. Following a placement hearing on April 18 and 19, 2007, the superior court granted Lara's request to place the children together in the home of Tessa and Jim "as expeditiously as possible following a transition process determined to be appropriate for each child," and it ordered OCS to work with the children's current foster parents to facilitate the transition and to "establish a plan to implement the ultimate placement." The superior court also ordered as a condition of the placement that Jim undergo alcohol treatment and that Tessa and Jim complete a parenting class program. The State moved for reconsideration, pointing to the 0.29 result of a portable alcohol breath test administered to Jim during the placement hearing. The superior court found that the result of Jim's breath test would not have affected its order given that it required Jim to complete alcohol treatment before the children were placed in the home he shared with Tessa. The court denied the State's motion for reconsideration in May 2007.

The next month, June 2007, Lara filed a relinquishment of her parental rights. In her relinquishment, Lara referred to the plan to place her children with Tessa and Jim and acknowledged that "[t]he department must receive a positive home study and the children must be in [Tessa and Jim's] adoptive home for 6 months before the department can consent to adoption of my children by [Tessa and Jim]." Her relinquishment also asserted that "[i]f [Tessa and Jim] become unable to care for my children for any reason, I retain the privilege to be notified that the placement is no longer available." Finally, her relinquishment requested that "[i]f the placement [with Tessa and Jim] is no longer available, the department will send me a letter by regular and certified mail to tell me that the placement is no longer available." The superior court incorporated these provisions into its order terminating Lara's parental rights.

Unfortunately, the placement of the children with Tessa and Jim failed. According to the children's guardian ad litem, Jim was in denial about his substance abuse problem and had not addressed it. Thus, in April 2008, about a year after the superior court's order placing the children with Tessa and Jim was entered, the court granted OCS's motion to vacate the order.

As provided in her relinquishment, Lara was informed that the children's placement with Tessa and Jim had failed. Lara then requested a review hearing to vacate the termination of her parental rights. She argued that "in light of the change in the proposed permanent placement for the children it is no longer equitable that the termination judgment be enforced by the court" and claimed that her "decision to relinquish her rights was made with the expectation that the children would ultimately be placed with the relatives as anticipated by the court's order." Lara also claimed that "she is presently capable of parenting her children" and requested that the termination of her parental rights be vacated. In this filing, Lara did not provide any explanation of the

---

**2.** Both Don and Ron relinquished their parental rights in June 2007. The termination of their parental rights is not at issue in this case.

basis for her contention that she was capable of caring for her children. In an affidavit filed with her reply to the State's opposition to her request for a review hearing, Lara for the first time set out the basis for her claim of rehabilitation and ability to parent her children:

1. I have been attend[ing] NA and AA meetings for a little over three months. I usually attend meetings at the Alano Club. I usually attend one or two times per week.

2. I am employed at a Holiday gas station on Tudor. I've been working there over 2 weeks. This is a full time job.

3. Prior to that job I was a barista at the Dimond mall. I worked there from February to May of this year.

4. Prior to this job I was working temporary jobs, for example a seasonal job at Sears.

5. I have become a more responsible person since June 2007. I am getting my bills paid off. I have lived in the same apartment for eight months.

6. I've been taking care of some health issues on a more regular basis. I have been trying to get regular medical coverage. I should be gett[ing] medical coverage with my job shortly.

7. I feel I have better emotional regulation than I did in [the] past. My meetings are helping me with this issue. I have more of a support system and have people I can call on for sober support.

8. I am requesting a hearing so that I can testify to the above facts and demonstrate my current ability to care for my children.

The superior court denied Lara's motion for a review hearing in an order that did not include any factual findings or legal conclusions. Lara appealed, arguing that a remand was necessary for the superior court to make specific findings supporting its denial and that she had demonstrated good cause for a review hearing. Apparently agreeing with Lara that the superior court's lack of find-

ings presented a problem, OCS and the guardian ad litem filed a joint motion asking us to remand the case to the superior court to issue written findings and conclusions on which its denial order was based. We granted this motion, and on remand the superior court entered factual findings and legal conclusions to support its order denying Lara's motion for a review hearing.

The superior court discussed Lara's history of substance abuse, her lack of compliance with her case plan, the children's placements and particular needs, and the CINA proceedings. The superior court concluded that even if it accepted Lara's "affidavit as completely factual, it would not provide good cause for an evidentiary hearing," reasoning that Lara's affidavit failed to establish that Lara had treated her substance abuse problem or that good cause existed to review the termination of her parental rights despite her "recent short term positive steps." The superior court further noted that Lara had failed to submit any evidence showing that her substance abuse had ceased and that she had "provided no evidence by even a preponderance" that she is currently capable of caring for the moral, emotional, mental, and physical welfare of her children. Addressing the children's best interests, the superior court determined that they "require a finalization of these proceedings" and "would be best served by placement together." The superior court concluded that any further delay in finalizing the placement of the children in a permanent home would be detrimental to their best interests.

Before us in this appeal is the question whether the superior court abused its discretion in determining that Lara failed to show that there was good cause to hold a review hearing.

## III. STANDARD OF REVIEW

■ We review a trial court's decision to deny a review hearing for failure to show good cause under AS 47.10.089(h) for abuse of discretion.[3] A trial court abuses its dis-

---

3. See *Alden H. v. State, Office of Children's Servs.*, 108 P.3d 224, 228 (Alaska 2005) ("A finding that a party failed to show good cause that a [*Rita T.*

*v. State*, 623 P.2d 344 (Alaska 1981)] hearing should be held is reviewed for abuse of discretion."); *C.L. v. P.C.S.*, 17 P.3d 769, 772 (Alaska

cretion only if its decision arises from an improper motive or is arbitrary, capricious, or manifestly unreasonable.[4]

## IV. DISCUSSION

■ Alaska Statute 47.10.089 governs voluntary relinquishment of parental rights and addresses reinstatement of voluntarily relinquished parental rights in subsection (h). This subsection provides in full:

> After a termination order is entered and before the entry of an adoption or legal guardianship decree, a person who voluntarily relinquished parental rights to a child under this section may request a review hearing, upon a showing of good cause, to vacate the termination order and reinstate parental rights relating to that child. A court shall vacate a termination order if the person shows, by clear and convincing evidence, that reinstatement of parental rights is in the best interest of the child and that the person is rehabilitated and capable of providing the care and guidance that will serve the moral, emotional, mental, and physical welfare of the child.

Because a good cause showing necessarily relates to the grounds for vacating a termination order and reinstating parental rights under AS 47.10.089, in order to obtain a review hearing a person must make a prima facie showing that: (1) it is in the child's best interest that the person's parental rights be reinstated, (2) the person is rehabilitated, and (3) the person is capable of caring for the child's moral, emotional, mental, and physical welfare.

Lara's opening memorandum supporting her request for a review hearing provided only a scant showing on these statutory requirements. Lara simply claimed in a conclusory manner that "she is presently capable of parenting her children," and she did not explain the basis for her contention. Lara instead rested her request for a review hearing primarily on her argument that it was "no longer equitable that the termination judgment be enforced by the court" because

her "decision to relinquish her rights was made with the expectation that the children would ultimately be placed with [Tessa and Jim] as anticipated by the court's order," which had been vacated. Yet in Lara's relinquishment of her parental rights, she acknowledged that the plan to place her children with Tessa and Jim might fall through:

> The department has decided to place my children for adoption with [Tessa and Jim] in accordance with the permanency plan. The department must receive a positive home study and the children must be in the adoptive home for 6 months before the department can consent to adoption of my children by [Tessa and Jim]. If [Tessa and Jim] become unable to care for my children for any reason, I retain the privilege to be notified that the placement is no longer available. If the placement is no longer available, the department will send me a letter by regular and certified mail to tell me that the placement is no longer available.

From this we can infer that Lara fully contemplated the possibility that the placement of her children with Tessa and Jim might fail. Yet Lara did not condition the relinquishment of her parental rights on her children being placed with them.

It was not until Lara filed a reply to the State's opposition to her request for a review hearing that she attempted to offer any evidence addressing the statutory requirements for showing good cause. Lara stated in an affidavit filed with the reply that she had been attending narcotics or alcoholics anonymous meetings one or two times a week for just over three months; that she had been working full-time for about two weeks, starting just a few days before she filed her request for a review hearing; that she believed that she had become more responsible and had better "emotional regulation"; and that she was addressing some of her health issues. Lara's affidavit indicated commendable but limited progress toward rehabilitation and it barely scratched the surface of

---

2001) (reviewing the superior court's finding of good cause to deviate from the placement preferences of the Indian Child Welfare Act for abuse of discretion).

**4.** *Monzingo v. Alaska Air Group, Inc.,* 112 P.3d 655, 659 (Alaska 2005).

what was needed to show that Lara was rehabilitated and capable of caring for her children's welfare. As the guardian ad litem noted, "[w]hat Lara did NOT say is telling: She did not claim she was no longer using substances; she did not claim she had participated in any kind of substance abuse treatment, whether residential or outpatient; she did not claim she had a lengthy history of negative urinalysis results." And Lara never addressed the best interests of her children. As the trial court concluded, even if Lara's affidavit were accepted "as completely factual, it would not provide good cause for an evidentiary hearing."

Even before AS 47.10.089 was enacted in 2005,[5] we had addressed whether parents could attempt to reinstate their parental rights before their children had been adopted and what showing would be required to establish good cause to hold a review hearing.[6] In *Rita T. v. State*, a mother whose parental rights had been involuntarily terminated sought a hearing to review the termination.[7] We held that "parents are entitled to a review of the order terminating their parental rights upon a showing of good cause for the hearing."[8] We further determined that "[g]ood cause could be established if the parents showed that it would be in the best interests of the child to resume living with them because they have sufficiently rehabilitated themselves so that they can provide proper guidance and care for the child."[9] We ruled in *Rita T.* that the mother had made a sufficient showing of good cause by declaring in her application for a hearing "that as a result of a fourteen-month rehabilitation program she ha[d] overcome the problems that led to the termination of her parental rights" and "that professional counselors, social workers and others would be able to establish that she is now capable of providing a warm and loving home for" her daughter.[10]

In *Alden H. v. State, Office of Children's Services*, a father who voluntarily relinquished his parental rights sought a hearing to review his relinquishment.[11] Although we declined to answer the question whether parents who voluntarily relinquished their parental rights could seek a review hearing upon a showing of good cause under *Rita T.*, we held that the trial court did not abuse its discretion in finding that the father failed to show good cause and in denying the review hearing.[12] We reasoned that the evidence offered by the father to demonstrate his rehabilitation was "weak" because although the father offered evidence indicating that he had completed one aspect of his case plan, his evidence for satisfying the three other aspects of his plan was "flimsy."[13] We explained that the only evidence in the record of the father's efforts to satisfy these three other aspects of his case—plan attending twelve-step meetings on a regular basis, completing a parenting class, and obtaining an anger management assessment and the resulting recommended treatment—was a letter from an associate director of an outpatient clinic.[14] We determined that the letter was "scant evidence" of the father's rehabilitation because it failed to address the scope of the programs that the father attended and whether the father continued to seek treatment upon completing the programs.[15] Moreover, we determined that the trial court reasonably discounted the credibility of the letter.[16] We further reasoned that the trial court's finding that the father lacked the parenting abilities to address his children's special needs "was well supported by the record," which included reports of the children's therapists and that there was "no

5. Ch. 64, §§ 17, 67, SLA 2005. The statute took effect immediately on June 30, 2005. *Id.*

6. *Alden H.*, 108 P.3d 224; *Rita T.*, 623 P.2d 344.

7. 623 P.2d at 345–46.

8. *Id.* at 347.

9. *Id.*

10. *Id.*

11. 108 P.3d at 226.

12. *Id.* at 231.

13. *Id.* at 232–33.

14. *Id.*

15. *Id.* at 233.

16. *Id.*

reasonable psychological probability" that the father could meet his children's needs.[17]

This case is much closer to *Alden H.* than *Rita T.* In concluding that the father failed to show good cause for a review hearing in *Alden H.*, we reviewed each aspect of the father's case plan and the progress that he had made on each of its requirements.[18] Here, Lara's case plan required: (1) a substance abuse assessment and compliance with the recommended treatment that Lara complete a "90–day residential program,"[19] (2) urinalysis testing, (3) a mental health evaluation and treatment, and (4) parenting classes. The single piece of evidence that Lara presented in support of having completed any of these requirements was her mention that she was attending "one or two" narcotics or alcoholics anonymous meetings a week. She did not state that she had participated in or completed the required inpatient treatment program nor did she indicate that she had successfully complied with urinalysis testing. We can contrast Lara's assertion with *Rita T.*, where we found that the mother had shown good cause having declared in her application for a review hearing "that as a result of a fourteen-month rehabilitation program she ha[d] overcome the problems that led to the termination of her parental rights."[20] Similarly, though Lara's affidavit also mentioned that she had "been taking care of *some* health issues *on a more regular basis* " and that she had "been trying to get regular medical coverage," which she expected to receive through her job shortly, she did not state that she had addressed her mental health issues. (Emphasis added.)

Lara argues that the trial court "failed to consider the record as a whole" and that it "limited [its] consideration of good cause to Lara's affidavit" in deciding that her substance abuse had not been rehabilitated. But the trial court provided detailed factual findings concerning Lara's sporadic participation in substance abuse treatment in the

past, and it concluded that her attendance at narcotics and alcoholics anonymous meetings for just over three months did "not come close to establishing she has addressed her substance abuse issues." It was reasonable for the trial court to consider Lara's progress in treating her substance abuse problem within the context of her prior drug abuse and her history of failure in residential drug-treatment programs. The trial court recognized that Lara had missed 67 of her 102 appointments for urinalysis tests between late April and early September 2005, that she had repeatedly tested positive for cocaine and opiates, and that she had failed to complete several rehabilitation programs for her substance abuse. In light of these findings, the trial court did not abuse its discretion in concluding that Lara had failed to establish that she had overcome her substance abuse problem despite her "recent short term positive steps."

Lara also asserts on appeal that the record contains evidence that reuniting her with her children would serve their best interests. But she utterly failed to address this point in her request for a review hearing in the trial court. And the trial court's determination that her children "require a finalization of these proceedings" and "would be best served by placement together" and that further delay in finalizing their placement in a permanent home would be detrimental to their best interests is well supported by the record. There was evidence provided during the CINA proceedings by the guardian ad litem, OCS social workers, and the children's foster parents detailing the many years that the children have been in foster care, Earl's difficulty in transitioning to a new home, Earl's desire to be permanently placed with his brothers, and Herb and Roan's foster parents' interest in adopting all three children. We therefore agree that it was in the

**17.** *Id.* at 232.

**18.** *Id.* at 232–33.

**19.** Although Cook Inlet Tribal Council recommended only intensive outpatient treatment, in contrast to the two prior recommendations that

Lara complete ninety days of residential treatment, it is undisputed that Lara was not truthful about her prior drug use during Cook Inlet Tribal Council's assessment.

**20.** 623 P.2d 344, 347 (Alaska 1981).

children's best interests to finalize the CINA proceedings.[21]

## V. CONCLUSION

Because the superior court did not abuse its discretion in denying Lara's motion for a review hearing to vacate her voluntary relinquishment of her parental rights, we AFFIRM the superior court's order.

---

21. Lara further asserts that providing a hearing is "[a]rguably ... the minimal due process that the legislature intended when drafting AS 47.10.089(h)" and that it would not have been burdensome for the trial court to afford her a hearing. But in adopting AS 47.10.089(h), the legislature unambiguously conveyed its intention that a review hearing be held only "upon a showing of good cause." Lara did not make that showing.